Filed 11/23/22 In re A.J. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B317007 (Super. Ct. No. PJ53099) (Los Angeles County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.J.,<br><br>    Defendant and Appellant. | |

The juvenile court ordered A.J. committed to the custody and care of the Division of Juvenile Justice (DJJ) after sustaining allegations that he committed first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)) and assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4)). A.J. contends: (1) the murder finding should be vacated because his actions did not cause the victim's death, and (2) there was

insufficient evidence that he would benefit from a DJJ commitment.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

*O.G.'s murder*

Around 3:00 a.m. on June 20, 2019, O.G. lay down in a Los Angeles park.  A few hours later, A.J. approached O.G. and stabbed him in the abdomen approximately 13 times.  Police responded and took O.G. to the hospital, where he underwent surgery.

Over the next three days, nursing staff reported that O.G. had a distended abdomen and decreased bowel sounds.  These were signs of an ileus, a condition in which the bowel stops moving.  Staff nevertheless advanced O.G.'s diet from liquids to pureed foods.

O.G. began vomiting on June 24.  Hospital staff performed an X-ray and discovered an ileus.  Upon this discovery, they stopped O.G.'s oral intake, but he continued vomiting.  He inhaled some of the vomit and went into cardiac arrest.  O.G. died the next day.

Dr. Scott Luzi performed an autopsy on O.G.  He testified that O.G. suffered two stab wounds, each of which penetrated the bowel and eventually led to his death.  Other factors that may have contributed to O.G.'s death included hypertension, cardiovascular disease, and cirrhosis.  But the stab wounds were the proximate cause of death: O.G. lost blood from the wounds, which stressed his heart and liver; then "his system started to fail, and from that he died."

As to the ileus, Dr. Luzi said that developed either when A.J. stabbed him or during surgery.  The stab wounds caused it either way.

2

Dr. Ryan O'Connor reviewed the autopsy report and O.G.'s medical records. Dr. O'Connor said that O.G.'s most significant injury was a stab wound that penetrated his abdomen and cut through a blood vessel. That blood vessel was repaired during surgery. O.G. was stable when he left the operating room.

Dr. O'Connor said that O.G. developed an ileus after surgery. Such a development was "not uncommon," so hospital staff should check to ensure that a patient's intestines are moving things along properly before advancing their diet. That did not happen before advancing O.G.'s diet, however: For several days, O.G. was "demonstrating physical exam findings consistent with an ileus . . . [b]ut [an] X-ray was not ordered until after his diet was advanced and even after he began vomiting." Advancing O.G.'s diet prematurely, without performing an X-ray, was below the standard of care.

O.G.'s immediate cause of death was "cardiac arrest, secondary to aspiration, secondary to ileus." O.G.'s ileus and the advancement of his diet resulted in him vomiting. He then inhaled some of the vomit, which led to his cardiac arrest and ultimate death. Dr. O'Connor believed that O.G. would still be alive if he had received proper medical care.

*The disposition hearing*

Before the October 2021 disposition hearing, a probation officer reported that A.J. had not complied with the terms of his prior probation. Most significantly, he was absent without leave (AWOL) from a short-term residential treatment program when he stabbed O.G. The officer recommended that the juvenile court order A.J. placed in a secure youth treatment facility (SYTF).

At the hearing, Los Angeles SYTF officials said that minors in its program were currently housed in juvenile hall since it did

3

not yet have a permanent facility. Such a facility would likely be completed in late 2021 or early 2022. Once that facility was in place, it would provide a 12-step program called "Criminals and Gang Members Anonymous" to help minors deal with "lifestyle addictions to criminal thinking." The program was not unique to the SYTF.

A psychologist opined that A.J. has a depressive disorder and substance use disorders. He had "some periods of bad behavior" in juvenile hall, including at least three physical altercations. The psychologist projected that A.J.'s reception to DJJ services would be "moderate" or "tepid." He would have a greater chance of success if sent to a local SYTF because of the greater continuity of care it would provide.

A DJJ supervisor said that the division planned to offer its current array of services—including anger management, mental health treatment, and educational services—until its scheduled closure in June 2023. (See Welf. & Inst. Code,[1] § 736.5, subd. (e).) That plan was not a "complete[] guarantee," however, because it was "difficult to speculate exactly . . . how the next . . . 20, 21 months will go." He said that if A.J. were immediately committed to the custody and care of DJJ he would likely start to receive services in March 2022. A.J. would thus receive about 17 months of services before DJJ's closure.

After considering SYTF and DJJ placements, the juvenile court concluded that a DJJ commitment was appropriate. DJJ was an existing program that would run through June 2023. Although A.J. would only receive 17 months of services, that was more beneficial than the "not that impressive" SYTF

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code.

4

programming—programs that were "basically the same" as those A.J. had failed previously. DJJ, in contrast, was "state of the art in terms of rehabilitation." Its greater security measures—measures that could not be duplicated in a less-restrictive placement like the SYTF—were also beneficial to "an AWOL risk" like A.J.

The juvenile court cited additional factors that supported a DJJ commitment: the severity of A.J.'s offense and his role therein, his escalating history of delinquency, and the vulnerability of his victim. It was "fully satisfied" that "the mental and physical conditions . . . of [A.J.] render it probable that [he] will benefit from" DJJ. The court ordered him committed for a maximum term of 25 years to life.

DISCUSSION

*Liability for O.G.'s death*

A.J. contends the true finding on the murder allegation must be vacated because the treating hospital's gross negligence caused O.G.'s death. We disagree.

To be liable for murder, a minor's criminal act must proximately cause the victim's death. (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 552.) "In general, '[p]roximate cause is clearly established where the [minor's] act is directly connected [to] the [victim's] resulting injury, with no intervening force operating.'" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*).) But grossly negligent medical care can be an intervening force that absolves a minor of murder liability, provided that "the maltreatment is the *sole* cause of death." (*People v. Roberts* (1992) 2 Cal.4th 271, 312, emphasis added.)

Here, we need not decide whether the hospital was grossly negligent in treating O.G. because A.J has not shown that the

5

alleged negligence was the sole cause of death. Where multiple factors contribute to a victim's death, a minor will be liable for murder so long as their criminal act was a ""substantial factor contributing to the result[ing]""" death. (*People v. Sanchez* (2001) 26 Cal.4th 834, 847; see also *Cervantes, supra*, 26 Cal.4th at pp. 866-867 [person may be criminally liable for murder "even though there is another contributing cause"' to victim's death].) A substantial factor is "more than a trivial or remote factor." (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1131.) We review for substantial evidence whether A.J.'s act of stabbing was a substantial factor in O.G.'s death. (*In re A.M.* (2009) 173 Cal.App.4th 668, 674.)

It was. Dr. Luzi testified that O.G. suffered stab wounds that penetrated his bowel. Those wounds were the proximate cause of O.G.'s death: They caused him to lose blood, which stressed his heart and liver and eventually led to his death. And to the extent the ileus contributed to the death, Dr. Luzi testified that it too was a result of the stab wounds A.J. inflicted. This testimony provides substantial evidence that supports the juvenile court's determination that A.J. is liable for O.G.'s murder. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [testimony of single witness satisfies substantial evidence standard].) That Dr. O'Connor had a different opinion as to O.G.'s cause of death does not negate this conclusion; as a reviewing court we do not resolve evidentiary conflicts. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

*DJJ commitment*

A.J. next contends the juvenile court's disposition order should be vacated because there was insufficient evidence of a probable benefit to him from a DJJ commitment or that a

less-restrictive placement would be inappropriate. We again disagree.

When determining an appropriate disposition, a juvenile court must consider "(1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.) If DJJ is among the potential dispositions, the court must also consider local alternatives to a DJJ commitment. (§ 736.5, subd. (c).) A DJJ commitment additionally requires evidence of a probable benefit to the minor and evidence that less-restrictive alternatives would be inappropriate. (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 485 (*Jonathan T.*).) We review for abuse of discretion. (*Ibid.*)

The juvenile court did not abuse its discretion when it ordered A.J. committed to the care and custody of DJJ. A.J. was 16 years old when he murdered O.G., and 18 by the time of the disposition hearing. That murder was a serious felony, the latest offense in an escalating history of delinquency.

The juvenile court also appropriately considered a local alternative to a DJJ commitment—the SYTF—but deemed it "not that impressive" because the programs it offered were "basically the same" as those A.J. had already failed. Such a less-restrictive placement would also be inappropriate because A.J. had gotten into altercations at juvenile hall while waiting for placement in the SYTF and because he was "an AWOL risk" at a facility with lower security. A DJJ commitment, in contrast, would likely benefit him due to its "state of the art" rehabilitation programs—programs a DJJ supervisor testified about at the disposition hearing—and its higher security levels. (See, e.g., *Jonathan T.*,

7

*supra*, 166 Cal.App.4th at p. 485 [minor's serious felony plus his "'history of running away'" justified DJJ commitment].)

This case is unlike *In re Carlos J.* (2018) 22 Cal.App.5th 1, on which A.J. relies. In that case, the evidence did not show that a DJJ commitment would probably benefit the minor "[b]ecause there [was] no specific information in the record regarding the programs" available there. (*Id.* at p. 4.) Here, in contrast, a DJJ employee testified at the disposition hearing about the anger management, mental health treatment, and educational programs available at the facility he supervised. Others testified about how those programs might benefit A.J. The juvenile court thus did not abuse its discretion when it ordered a DJJ commitment.

DISPOSITION

The juvenile court's jurisdiction and disposition orders, entered July 23 and October 20, 2021, are affirmed.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

8

Fred J. Fujioka, Judge

Superior Court County of Los Angeles

_____

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.